L. E. WATERMAN CO. v. FORSYTH et al.

(Circuit Court, S. D. New York. January 7, 1903.)

No. 7,335.

1. PATENTS—INFRINGEMENT—FOUNTAIN PENS.

The Waterman patent, No. 293,545, for a fountain pen, embodies a device which must be conceded patentable novelty and utility, taking into consideration its commercial success; but, in view of the prior art, it must be limited to the feature of the claims which describes fissures in the bottom or sides of the ink duct, designed to facilitate the flow of ink to the pen when in use, which were an improvement on any prior construction. As so limited, the patent is not infringed by a pen in which a reed is placed within the duct to perform the function of the fissures in securing capillary attraction.

In Equity. Suit for infringement of letters patent No. 293,545, for a fountain pen, granted to Lewis E. Waterman February 12, 1884. On final hearing.

Walter S. Logan (Fred C. Hanford and Samuel S. Watson, of counsel), for complainant.
William B. Whitney, for defendants.

HAZEL, District Judge. This action seeks an injunction and accounting because of alleged infringement of United States letters patent No. 293,545, granted February 12, 1884, to Lewis E. Waterman, for improvements in fountain pens. Subsequently, by mesne assignments, the title to the patent was conveyed to complainant corporation. The suit is against dealers selling the fountain pens manufactured by the Parker Manufacturing Company of Janesville, Wis., which company has defended the suit, and may therefore be regarded as the real party defendant. Numerous other suits have been brought and are now pending against dealers for infringement of the patent in controversy.

The improvement described in the patent refers to mechanism which controls the supply of ink to the writing pen from the reservoir or barrel. The usual defenses—anticipation, lack of novelty, and noninfringement—are in issue. The claims—three in number—read as follows:

"(1) An ink duct for a fountain pen, consisting of a bar having a longitudinal groove formed in its surface and one or more longitudinal fissures in the side or sides of said groove, substantially as set forth.

"(2) In a fountain pen, the combination, substantially as hereinbefore set forth, of a barrel or ink reservoir, a tube connected therewith, an ink duct supported within said tube, and consisting of a bar having one or more longitudinal grooves formed in that portion of its surface which is in proximity to the pen, with one or more longitudinal fissures in the side or sides of said groove or grooves of the pen, secured between said tube and ink duct.

"(3) A fountain pen having an ink duct provided with one or more longitudinal fissures formed in its walls for facilitating the passage of the ink through said duct."

The specification says that the object of the patent is "to secure and automatically regulate a certain and uniform flow of ink to the pen, and also to prevent the excessive discharge of the ink when the

pen is in use," and further to simplify the construction of this class of pens by having it composed of comparatively few parts.

The patentee proposes to accomplish the essential features of the patent by the formation of a simple channel with slits or fissures in the bottom or sides, extending longitudinally through the entire length of the feed bar, which is inserted in the nozzle of the pen. The feed bar or ink-feeding device serves as a conductor of the ink from the reservoir or barrel to the nib of the pen. The ink is drawn from the reservoir by gravity and through the action of capillary attraction in the act of writing. The novel features of the claims consist in the slits or fissures by which the ink is conveyed from the barrel or reservoir to the nib of the pen. The validity of the patent depends squarely upon the question whether the use of fissures extending lengthwise through the ink duct of the fountain pen is new and patentable. Defendants vigorously challenge the novelty of the claims, and cite numerous prior patents in support of the contention. The experts of complainant and defendants differ very materially as to the novelty of the claims.

I have found the greatest aid by a study of the exhibits and patents in evidence as to the state of the art at the time of the conception of the Waterman fissure patent. A considerable portion of the evidence was offered to show that the Waterman patent has been generally recognized throughout the United States, and that other manufacturers and dealers in fountain pens and the defendants have adopted equivalent infringing ink-feeding devices. I am well satisfied that Waterman, by his method of grooving and placing fissures in the bottom or sides, has improved the fountain pen, which fact the public has not been slow to appreciate. In view, however, of the disclosures in prior fountain pens, the patent in suit must be narrowly interpreted, and the monopoly restricted to the particular differentiating parts described. This conclusion is reached after an examination of the evidence and multitudinous exhibits in the case, although the decision of Judge Lowell, considering and interpreting the scope of the claims in Waterman v. Lockwood (decided Jan. 16, 1902) 123 Fed. 300, is strongly persuasive. In that case the patent here involved and the earlier Waterman patent, No. 307,735, were before the court. The latter patent was merely for a groove for carrying ink from the barrel or reservoir to the point of the pen. Judge Lowell held there was no novelty in this, and doubted its utility. He directed attention to the Lewis patent, No. 272,066, Figure 4, and the Holland patent, No. 276,692, in which are described grooves or ink ducts of gradually decreasing depth, such as described in claim 2 of the Waterman patent, No. 307,735. Is the patent valid which describes grooves or channels having fissures in the sides or bottom, carrying the ink to the pen, in combination with the ink nozzle and barrel? A "fissure" is defined by Webster as a "narrow opening made by the parting of any substance; a cleft, as a fissure of a rock." The definition, taken literally, is circumscribed in its meaning, and the patentee's undoubted intent was that the term "fissures" should be understood as an indentation in the fountain-pen groove or ink duct. The evidence of complainant tends to show that by the employment of fissures a de-

cided advantage over the prior art is obtained.    The flow of the ink to the pen is facilitated.    The specification says:

"The downward flow of the ink by gravity and through the action of capillary attraction in the act of writing causes it to pass through the groove, d, and tends to create a vacuum within the reservoir, which is met by the influx of air passing upward through the groove.    The direction of the current of air entering the ink reservoir being opposite to that of the outflowing ink, the volume of the latter is somewhat lessened, and excessive discharge prevented."

Complainant's testimony tends to show that, when the pen of the prior art was inverted in the pocket of the user, the ink was liable to leak out of a small hole or opening in the barrel.   Such an opening was necessary to permit air to enter the vacuum in the barrel caused by the outflowing ink.   Fissures in the groove simultaneously permit the downward flow of ink and the upward flow of air into the barrel or reservoir.   This makes it unnecessary to have an opening in the barrel for the admission of air.   Defendants contend that fissures, slits, tongues, and reeds in fountain-pen ducts were employed many years prior to the patent in suit.   I agree with the contention that ink ducts or grooves having tongues and reeds were old, and that a slit or fissure is found in a tube tapering to a point in the Slayton fountain pencil, No. 15,622, dated August 26, 1856, and in the Sackett patent, No. 353,162, of April 23, 1893.   But I am unable to find that the slits and fissures employed in these patents facilitated the flow of ink to the pen.   Tongues or removable reeds are found in the Prince patent, No. 12,301, of 1855;   Holland patent, No. 276,692; Stewart patent, No. 253,953;   Shaw British patent, No. 2,411 of 1853; Jordan patent, No. 6,883, November 20, 1849;   Lewis patent, No. 272,066;   Purdy patent, No. 279,104;   Ewer British patent, No. 800 of 1860;   and Cleveland patent, No. 10,469.   True, in some of them the ink duct is tubular, and it is manifest from a cursory examination that the earlier patents were crude in their construction.   The necessity for capillary spaces to regulate the flow of ink was also recognized long before Waterman.   Judge Lowell, in passing upon complainant's contention that by the means employed in its device the downward flow of ink through the groove, owing to capillary attraction, was functionally different from the prior art, quoted from the patent of Latourette, No. 147,333, dated February 10, 1874.   An inspection of this patent shows that capillary attraction as a force to bring ink into the pen was old.   The quotation is apt, and may with propriety be repeated:

"The capillary feeder is an important element to the successful operation of the fountain pen, in that it insures a feeding of the ink, and at the same time prevents the escape of it intermittently in globules as it does in other arrangements.   A piece of wire or a fine chain or a hair will serve well for a feeder, but a thread of fibrous material is the best."

It is doubtful whether the fissure in complainant's device performed any function other than was performed in the prior art by wire, reed, or tongue in aid of the feeder, except to facilitate the flow of ink to the nib of the pen.   The alleged infringing pen uses a removable reed, placed in the bottom of a square groove, for a feeding device, where it is held in place by friction with the side of the groove.

Long, narrow spaces are formed, securing the required capillary action. No fissures are made in the walls or bottom of the groove, as in complainant's patent, although the narrow spaces undoubtedly functionally carry the ink to the nib of the pen and into the barrel when it is unemployed. I think the reed employed by defendants, or its equivalent, is found in the prior art to which reference has already been made. The defendants' device is not like that of complainant. In Waterman v. Lockwood, supra, the spaces in the ink duct were made by a slender, removable reed, tapered to a point. Such spaces were made between the walls or sides of the groove. There is no material difference in the Lockwood and Parker devices. The Waterman device is stable and generally more durable. I think the pen is an improvement over the prior art, and that the alteration was more than a mere change of form or detail of construction, which an ordinary mechanic, skilled in the art, had made superior. The patentee chiefly desired to facilitate the flow of ink to the pen when in use. This result he has accomplished. The advantage attained over the prior art doubtless is owing to the alteration of the ink duct and the fissures in the bottom or sides of the groove. To this advantage I think the complainant is entitled. The commercial success of the invention should be considered when the novelty or utility of the patent is in great doubt. The success achieved, therefore, overcomes whatever doubt I may have as to the patentability of the device. I am not prepared to say that the patentee has in no practical way advanced the art. Washburn v. Gould, Fed. Cas. No. 17,214; Simonds v. Hathorn, 36 C. C. A. 24, 93 Fed. 958. In view of the prior art, however, the patent cannot be accorded a high degree of merit, and therefore it must be interpreted to cover merely the feature of the claims which describe fissures in the bottom or sides of the ink duct. As thus construed, the defendants do not infringe.

Bill dismissed, with costs.